IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

| | | |
|---|---|---|
| JUSTIN T. WELLER, et al., | : | |
| Plaintiff, | : | Case No. 3:24-cv-00154 |
| vs. | : | District Judge Thomas M. Rose |
| CITY OF URBANA, OHIO, et al., | : | Magistrate Judge Caroline H. Gentry |
| Defendants. | : | |

- - -

DEPOSITION

of KERRY L. BRUGGER, Corporate Representative of Defendant City Of Urbana, Ohio, herein, called by the Plaintiffs under the applicable Federal Rules of Civil Procedure, pursuant to notice and by agreement of counsel, at the offices of Surdyk, Dowd & Turner Co., LPA, 8163 Old Yankee Street, Suite C, Dayton, Ohio, commencing on Tuesday, October 13, 2026, at 10:00 a.m.

- - -



DECLARATION EXH. 9

APPEARANCES:

Patrick M. Quinn, Attorney at Law
Kylie A. Titer, Attorney at Law
Jeckering & Associates, LLC
10 North High Street, Suite 301
Columbus, Ohio 43215

On behalf of the Plaintiffs.

Dawn M. Frick, Attorney at Law
Surdyk, Dowd & Turner Co., LPA
8163 Old Yankee Street, Suite C
Dayton, Ohio 45458

On behalf of the Defendants, City of Urbana, Robert W. Bean, Audra M. Bean, Kerry L. Brugger.

ALSO PRESENT:

Justin T. Weller (Via Microsoft Teams)

- - -

INDEX TO EXHIBITS

\- - -


| DEPOSITION | MARKED |
|---|---|
| No. 61 - Defendant City of Urbana, Ohio's Responses to Plaintiffs' requests for admissions, interrogatories, and requests for requests for production of documents | 9 |
| No. 64 - Email | 31 |
| No. 65 - Email | 31 |
| No. 66 - Emails | 39 |
| No. 67 - Emails | 40 |
| No. 68 - Email | 43 |
| No. 69 - Emails | 44 |
| No. 70 - Calendar invitation | 49 |
| No. 18 - Emails | 58 |
| No. 73 - Emails | 67 |
| No. 74 - Emails | 83 |
| No. 76 - Emails | 84 |
| No. 77 - Email | 85 |
| No. 78 - Email | 87 |
| No. 81 - Contract | 92 |
| No. 82 - Email | 98 |
| No. 83 - Emails | 99 |
| No. 84 - Timeline and email | 195 |
| No. 85 - Meeting minutes | 109 |

INDEX TO EXHIBITS (CONTINUED)


| DEPOSITION | MARKED |
|---|---|
| No. 87 - Emails | 115 |
| No. 88 - Emails | 118 |
| No. 90 - Calendar meeting | 120 |
| No. 91 - Code violation notice | 123 |
| No. 92 - Email | 124 |
| No. 93 - Return of service and email | 126 |
| No. 94 - Letter to Mr. Brugger | 127 |
| No. 28 - Emails | 130 |
| No. 31 - Letter from Urbana Tomorrow | 132 |
| No. 96 - Email and Employee/Product/Equipment hours and rate | 136 |
| No. 97 - Emails | 138 |
| No. 98 - Letter and email | 139 |
| No. 99 - Email | 140 |

Tuesday Morning Session
October 13, 2026

- - -

STIPULATIONS

It is stipulated by and between counsel for the respective parties that the deposition of Kerry L. Brugger, Corporate Representative of Defendant City of Urbana, Ohio, called by the Plaintiffs under the applicable Federal Rules of Civil Procedure, may be taken at this time and reduced to writing in stenotypy by the Notary; whose notes thereafter may be transcribed out of the presence of the witness; and that proof of the official character and qualification of the Notary is waived.

- - -

KERRY L. BRUGGER

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

EXAMINATION

BY MR. QUINN:

Q. Can you state your name for the record, please.
A. Kerry Brugger.
Q. B-r-u-g-g-e-r?
A. Correct.
Q. Nice to see you again. I know you've been deposed before. So I can skip past most of the kind of preliminaries and the instructions we talked about the last time. The one important one, or the most important one, is still as before, I am not trying to trick you or trap you. If I ask you question and you don't understand it, can you please let me know and I'll be happy to rephrase that, okay?
A. Yes.
Q. And if I ask a question and you answer it, I'm going to have to assume that you understood my question; is that fair?
A. Yes.
Q. Now, you were deposed individually a couple of weeks ago. You understand that you are here today as the representative of the City of Urbana, correct?

Q. Audra Bean?
A. No.
Q. Mr. Carter?
A. No.
Q. Mr. Crabill?
A. No.
Q. Chris Boettcher?
A. No.
Q. Anybody at all other than legal counsel?
A. No.
Q. Did you look at or review any documents in connection with your deposition here this morning?
A. Only those I reviewed with the attorney.
Q. Can you tell me what documents you reviewed?
A. There's been reports turned in as records for the case.
Q. In order to prepare for today, did you look at any documents?
A. No.
Q. So what you were saying, the documents you're talking about you've looked at, were things you turned over previously?
A. Correct.
Q. Like maybe a year or so ago?

interrogatories, the written questions, can you tell me what personnel or individuals with the city were involved, other than legal counsel, were involved in providing answers to those questions?

MS. FRICK: I'm going to object to the extent it also would involve communications with the law director, which is legal counsel.

Q. Right. When I said legal counsel, I mean, I guess, at the time it was Mr. Feinstein and, of course, Ms. Frick and her colleagues. With that clarification, can you tell me what individuals were involved?

A. The individuals that had received a notification for documents, then we would meet and understood that they had to make sure we had clear and concise information that we had available.

Q. So the interrogatories themselves, the written questions, I'm not asking about documents, the written questions themselves, did you provide answers for any of them?

A. Any of --

Q. Any of the written questions?

A. I provided information on behalf of the city, yes.

Q. And who else did, other than you, Ms. Frick or

A. Correct.

Q. Anybody else that you're aware of?

A. Not that I'm aware of.

Q. Speaking for yourself, personally, when you received the interrogatories, do you recall there being any questions that you were not certain the answer to?

A. Any question that I was familiar with that I needed to answer, I answered.

Q. And were there any questions that were kind of within your remit to answer that you needed to do some research or do some background to find out the answer?

A. I guess how I would have to answer that, a lot of these were questions that I couldn't answer in terms of legalities.

Q. Sure. So we would ask the question and sometimes your counsel would interpose an objection, right, and I understand that that's something that counsel did. But in terms of the facts, take, for example, a look at Page 11, if you would, and look at, say, Interrogatory No. 12.

A. All right.

Q. Interrogatory No. 12, Explain the reasons for Defendant Urbana's actions, through its officials, regarding zoning cited against Plaintiff Justin or the Plaintiff Businesses, including any legal or policy justifications for

its actions.

When you got a request like that, or a question like that, were there any for which you didn't already know the answer at the time you received the question?

A. Generally I knew the answers to the questions.

Q. Okay. So you don't recall or do you recall any particular questions or any particular topics that you had to do some digging, do some research, do some investigation in order to give a complete answer on behalf of the City of Urbana?

A. I don't recall any specifics. There may have been some. I may have had to provide a date or something.

Q. Sure. The answers to the interrogatories and the requests for admissions, so not producing documents, the other two, did you provide the substantive answers to those questions or did somebody else provide them and you reviewed them?

A. I didn't typically review someone else's response. The ones I took care of, I took care of them.

Q. When you say take care of, tell me what you did to, quote, take care of them.

A. If there was a specific question that I needed to answer, that I would recall it, or if I had to find, again, a particular date, address, or something like that, I just

might have to verify that.

Q. So for the ones that were kind of your responsibility to answer, would you typically draft or prepare a response or did somebody else prepare a response that you then reviewed to make sure it was accurate?

MS. FRICK: Objection. Go ahead.

A. I prepared it.

Q. Okay. Take a look in Exhibit 61. Take a look at Page 12, if you would, please. And towards the bottom is Interrogatory No. 16, which says, Describe any interactions and/or communications Defendant Urbana, through its officials, had with any elected officials at the Federal, State, or Local level, or said officials' offices, employees, or representatives at any time concerning Plaintiff Justin or Plaintiff Businesses. And then there's an objection from your legal counsel and the response is, Defendant is aware the official(s) conversed with the relevant state representative about the state providing funds to Plaintiff. This conversation occurred while Plaintiff was present.

I will represent to you, and we can certainly pull it out if we need to. But I will certainly represent to you that that phrase about conversed with the relevant state representative also appears in a similar question

addressed to Mayor Bean and a similar question addressed to yourself. My question to you, or the City of Urbana, that phrase about conversed with the relevant state representative, is that something that -- who drafted that originally, who drafted that phrase in the response?

MS. FRICK: Objection. You can answer that, if you know.

Q. If you know.

A. I don't recall what statement you're referring to.

Q. Okay. So the statement is, Defendant is aware the officials conversed with the relevant state representative. And what I'm telling you, I asked a similar question, or my office asked a similar question to you, individually, and also to Mayor Bean, and all three of you, Mayor Bean, yourself, individually, and the city answered with that same phrasing about defendant is aware the officials conversed with the relevant state representative. My question to you is, who drafted that phrase, Defendant is aware the officials conversed with the relevant state representative that then appeared across three different sets of discovery responses?

A. I don't recall who actually drafted the response.

Q. So do you recall you doing it?

A. I recall having that conversation about it but I don't know. I don't recall that I drafted it.

Q. Fair enough. The City of Urbana, let's talk about kind of structural things. The City of Urbana has a mayor and a city council, right?

A. Right.

Q. City council has seven members?

A. Correct.

Q. And it has a city administrator or sort of akin to what might be called the city manager in another jurisdiction, right?

A. I don't follow your question. The administrator has nothing to do with city council.

Q. Maybe I misspoke. There's a city administrator who performs functions that might otherwise be referred to as a city manager?

A. Correct.

Q. That's what I'm looking at. And, Mayor Bean, I will tell you, described himself as kind of the CEO of the City of Urbana. Would you agree with that kind of analogy?

A. Ultimately, he's CEO of the city.

Q. And the director of administration reports to the mayor, correct?

A. Correct.

your understanding of what the allegations behind the recall are?
A. That's what I understand.
Q. And as I understand it, this data center project involved the city annexing certain real estate into city limits, right?
A. I think there's a lot more to it than that.
Q. That's not all of it, but that is a piece of it that was required is the city had annexed some land that was outside the city and bring it within the city limits, right?
A. The county petitioned the city to take it.
Q. And that was the city's decision to do it or not and the city elected to do so, correct?
A. City council agreed.
Q. As I understand it, there are some sort of economic development benefits, whether they be tax abatements or something along those lines granted to this data center project; is that right?
A. I don't know. That happened since I left.
Q. The data center is, as I understand, a private entity, right, a private business?
A. Yes.
Q. And annexing the land on which the data center is built or is to be built could be construed or could be

Q. When you were preparing to give your deposition today, did you, excluding legal counsel, did you speak to anybody about any kind of yard signs or any yard sign incidents in 2019?

A. Since you brought it up, I just want to circle back to something you said earlier in the deposition.

Q. Sure.

A. This one just kind of triggered a thought. You asked me at the beginning as I prepared for this deposition did I review documents, and I referred to, yes, I reviewed exhibits. But I reviewed things that I had access to, city charter, city ordinances, things that I had public access to. So I want to be clear at the beginning I was thinking you were referring to something specific. We talked about some things, I looked through exhibits that I knew were there and I did look at the charters and the ordinances and anything else that I thought might be relevant, just to clear that up.

Q. I appreciate that. Among the ordinances that you looked at in preparation for today, did you look at the Urbana Sign Ordinance?

A. I did peruse it, yes.

Q. Was there anything in there that you recall setting a time limit in which political campaign signs can

to preserve documents related to Mr. Weller or any potential litigation involving Mr. Weller?

A. The employees that were identified, the city officials that were identified in the letter, we met with our attorney, law director, and just asked everybody to start pulling documentation. He then directed how he would like to have --

MS. FRICK: I don't want you to commit to what he directed, but you can still talk about what the city did.

A. It preserved documents and created files to put things in.

Q. You said the individuals that received letters are the ones who met to discuss; did I understand you right?

A. The employees report to me. We made sure that they got their letter.

Q. Earlier you covered, you mentioned probably about a dozen or so different departments or department heads that report to you or report to the director of administration. Did each of them meet with either yourself or with the law director in relation to preserving documents about Mr. Weller?

A. I guess explain what you're -- I don't know what your question is.

Q. The city received a letter from a law firm saying

we represent Mr. Weller; we're considering filing suit. And I think what you told me is the city employees kind of got together and they met with legal counsel in the law director's office, right?

A. Right.

Q. I'm asking what employees were part of that process, like specific people?

A. Preston Carter, Doug Crabill, myself, Mayor Bean. From the city's employees side, I don't know if there's any others besides those.

Q. Have you ever heard the phrase litigation hold? Is that a phrase that you're familiar with?

A. I'm not familiar with it.

Q. The folks that met, the city employees that you identified that met, did that include any kind of IT department or IT officials with the city?

A. No.

Q. As I understand it, the city doesn't have an in-house IT department. It contracts with like a third party company to provide IT services; is that right?

A. Correct.

Q. And Mayor Bean referred to kind of the person in charge as a guy named Jake. Do you know who that is?

A. Jake, he's the on-site tech.

Q. He's employed by somebody else, but he's physically located in the city offices; is that right?

A. Right.

Q. And did anybody with the city meet with Jake or anybody else with kind of the IT function about preserving documents?

A. To my understanding, they were not involved unless there were limits on email size, how we could forward certain things. If Mark wanted a certain document, if it was too large, they would be able to increase what an individual employee could send. There's a threshold. I don't understand IT stuff. I've got a limit; I can't send this document. They could go in and temporarily increase their capacity.

Q. When the city received letters indicating that Mr. Weller was contemplating litigation, what, if anything, did the city inform Jake or anybody else in the IT function about any changes that may need to be made to document retention emails or anything of the sort?

A. I'm not aware of any specific items that were brought to their attention.

Q. Now, subsequent, the complaint in this case was filed in May of 2024, and there were some discovery requests sent later on. We looked at some of those earlier a few

weeks ago and earlier today as well. Can you tell me what the city did in order to obtain response documents in response to the request for production of documents that were served on it?

A. The individuals then would look at their emails and asked to create a file, if you will, to put those emails in and then deliver them.

Q. A couple things to unpack there. The individuals you referred to, are those the same folks that you ticked off earlier?

A. Yes.

Q. Yourself, Mr. Carter, the mayor, et cetera?

A. Yes.

Q. And in order to search emails, how were the individuals that we're talking about, were they given a list of terms to search?

A. I think everybody looked for common terms whether it be a name, a property, a specific date. Try to get three or four, five different searches to make sure that we're capturing everything we could.

Q. Is there a list somewhere of what terms individuals used to search their records?

A. I'm not aware of a list.

Q. Okay. The individuals that we're talking about,

were any of them -- did the city direct any of them to search any personal devices or personal email accounts for anything that might be related to Mr. Weller or this litigation?

A. No, because there shouldn't be any. There isn't any.

Q. There shouldn't be but sometimes things that shouldn't exist sometimes happen anyway. Were those ever checked to your knowledge or to the city's knowledge?

A. Not to the city's knowledge.

Q. You talked in terms of date ranges when the individuals were searching their emails. Were they given any date, particular date ranges, with which to follow?

A. No.

Q. Was anything other than emails searched within the city's documents or records?

A. Emails and if they had electronic folders or files that they kept.

Q. Were any of the individuals we're talking about, were they directed to search any personal computers or electronic devices for any record, non-email electronic documents?

A. Not to my understanding.

Q. Does the city maintain any files, documents, that

are solely in paper format?

A. Yes.

Q. And did anybody with the city or associated with the city search any of those paper files for anything related to Mr. Weller or this litigation?

A. It's all part of, if you have it electronically, we prefer it electronically. If you have it on paper, we want it paper. However you maintain it, that's how we want to keep it.

Q. The folks we're talking about would search both their electronic devices, as we've discussed, and whatever paper files?

A. Any files they maintained.

Q. The individuals that we're talking about are yourself, Mr. Carter, the mayor, who else?

A. The city officials. The city council would have had their own discussion with Mr. Feinstein.

Q. And did the city council members also search their electronic and paper records similar to what we discussed?

A. I would have to assume they did. That was not my realm.

Q. Is there a city clerk or council clerk or clerk of city council, somebody like that?

A. The law director has a council clerk and all of city council.

Q. Does the clerk of council report to the law director?

A. Yes.

Q. So we have kind of the individuals that we've named, city council. What other city employees or officials searched for electronic or paper files in connection with Mr. Weller or this lawsuit?

A. Right now I don't know of any others unless they would have something to offer. To my understanding, we were looking for those who had regular business with him.

Q. And who decided whether somebody interacted with Mr. Weller enough to warrant searching their documents? Who made that call?

A. Typically it was me, the director of administration, and discussion with the law director.

Q. So the Urbana Youth Center, and, I apologize, I think I may have asked you this before, do you recall when that opened?

A. I don't recall.

Q. Is it still in existence today?

A. My understanding it is.

Q. Still owns a property on Main Street, I believe;

CERTIFICATE

State of Ohio :
ss:
County of Franklin :

I, Jodi L. Correll, a Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named Kerry Brugger was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the deposition then given by him was by me reduced to stenotype in the presence of said witness, afterward transcribed by computer; that the foregoing is a true and correct transcript of the deposition so given by him; that the deposition was taken at the time and place in the caption specified and was completed without adjournment; and that I am in no way related to or employed by any attorney or party hereto, or financially interested in the outcome of the said action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on this 18th day of October, 2026.

/S/ Jodi L. Correll
______________________________
JODI L. CORRELL, Notary Public in for the State of Ohio and Registered Professional Reporter

My commission expires 2-25-31.